DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**JANE DOE** f/k/a **DIANA JOHNSON,**
Appellant,

v.

**PAUL FINKELMAN, CAVIAR LA LLC, ANNAPURNA PICTURES LLC,
MEGAN ELLISON, EVAN GOLDBERG, BERT HAMELINCK, JASON
WOLINER, PEACOCK TV LLC, POINT GREY PICTURES LLC,
SETH ROGEN, MICHAEL SAGOL,** and **JAMES WEAVER,**
Appellees.

No. 4D2024-1978

[December 3, 2025]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; G. Joseph Curley, Judge; L.T. Case No. 502023CA014138.

Jonathan L. Gaines and Karen L. Stetson of GrayRobinson, P.A., Miami, for appellant.

Jay Ward Brown, Charles D. Tobin, and Emmy Parsons of Ballard Spahr, Washington, D.C., for appellee Paul Finkelman.

Michael K. Twersky and Alberto M. Longo of Fox Rothschild LLP, Blue Bell, Pennsylvania, and Alex L. Braunstein of Fox Rothschild LLP, West Palm Beach, for appellees Caviar LA LLC, Annapurna Pictures LLC, Megan Ellison, Evan Goldberg, Bert Hamelinck, Jason Woliner, Peacock TV LLC, Point Grey Pictures LLC, Seth Rogen, Michael Sagol, and James Weaver.

LEVINE, J.

Appellant appeals the trial court's order dismissing, with prejudice, her amended complaint for defamation and conspiracy to defame. The trial court found that the "docuseries" at issue was a single publication rather than multiple publications, and further that the series was not "of and concerning" appellant, and that the statements in the series were not capable of defamatory meaning. We disagree. Because the amended complaint alleged legally sufficient causes of action for defamation and conspiracy to defame, we reverse the dismissal order and remand.

Appellant filed an amended complaint against the defendants/appellees for defamation per se and conspiracy to defame. According to the amended complaint, defendant Paul Finkelman wrote a book entitled *Duplicity: A True Story of Crime and Deceit* in which he accused appellant—his ex-wife—of various criminal acts, including prostitution and being the "madam" of a prostitution ring. Based on the book, the defendants created, produced, and published a "docuseries," entitled *Paul T. Goldman,* which was streamed and distributed on Peacock TV. The series consisted of six episodes released on four different dates. The first three episodes were released on January 1, 2023; the fourth episode was released on January 8, 2023; the fifth episode was released on January 15, 2023; and the sixth episode was released on January 22, 2023.[1]

The series featured Finkelman as himself, using the alias "Paul T. Goldman." Finkelman revealed his true identity throughout the series. Appellant's amended complaint alleged that the series referred to appellant by a fictitious name, "Audrey Munson." Appellant alleged that she was "easily identifiable as the subject of the false and defamatory statements published by Defendants."

According to the amended complaint, the format of the show was a documentary that operated on "multiple levels." One level was the "real life" story of Finkelman as told by the actual persons involved in the events and by actors portraying the actual persons. The second level was a "making of" documentary where the audience was taken "behind the scenes" during filming and was "privy to parts of the actual creative process."

The amended complaint asserted six counts of defamation per se and six counts of conspiracy to defame, with one count for each individual episode. In the alternative, the amended complaint asserted one count of defamation per se and one count of conspiracy to defame, with each count based on the series as a whole.

The amended complaint summarized each of the episodes. The trial court also reviewed the entire series, which the parties agreed could be considered as part of the complaint.[2] The docuseries included the following highlights in the six-part series:

Episode 1: This episode began with a statement from the director that

---

[1] The series was still being streamed on Peacock TV during this appeal.
[2] The series was included as part of the record on appeal.

Finkelman said he "had an incredible true story to tell" and that "[t]his is his story." An actual newsclip covering Finkelman's divorce, which included an interview with Finkelman himself, reported his accusations that appellant had a "secret double life," a "sexy secret," and was involved in a "multi-million dollar crime ring." A series of quick clips foreshadowed future episodes. Finkelman then stated, "It's all true. It happened to me," and "I couldn't make this up."

Finkelman met appellant, referred to by the pseudonym "Audrey Munson," through an online dating site. Finkelman accused appellant of marrying him for his money. Finkelman claimed that, after their marriage fell apart, Finkelman discovered that appellant lived a "secret double life," and what he found "turned into a whole new level of criminality." Finkelman stated that "[t]his is not a little ring" and that "I couldn't believe it, but I had to believe it." Finkelman stated, "Multiple agencies don't get involved if there's nothing there." The viewer was then shown a photo of Palm Beach County Sheriff Ric Bradshaw and what appeared to be an arrest report with a suspect's photo blocked out.

Episode 2: Finkelman stated that his book, *Duplicity*, upon which the series was based, was as "accurate as it is unbelievable." Finkelman reaffirmed that *Duplicity* was 99% true and that only little things were embellished. Finkelman obtained appellant's phone records during their divorce proceedings. Based on the phone records and a conversation with appellant's ex-husband, Finkelman concluded that he married a "hooker." Finkelman stated that appellant had sex with over one thousand men. Finkelman also stated that appellant was a "madam" with a huge business and ten girls working for her. Finkelman vowed to "bring down [appellant] and her sleezy prostitution ring no matter what."

Episode 3: Finkelman consulted with a psychic, who stated that appellant was part of a "big time prostitution . . . ring." Finkelman once again stated that "[t]he story is true. The events are true." He then clarified that his story was approximately 97% true "and none are made up that have any bearing to criminal events by Audrey Munson [appellant] and what happened to me. Every single thing of that is true."

Finkelman hired a private investigator to follow appellant. A surveillance video from the private investigator showed appellant, with her face blurred out, and two other women at a park. At one point, they appeared to be praying together. From this video, Finkelman stated that they were "hookers praying to Jesus for more tricks" and that this was "not a little prostitution ring."

3

Finkelman admitted he invented scenes with appellant and her alleged pimp, "Royce Rocco." He used his "imagination" to write a scene involving a phone conversation between appellant and Rocco that occurred on appellant and Finkelman's wedding night.

Finkelman's investigator recalled an incident where appellant met with Rocco at a nightclub. The investigator said Rocco told another man, while referring to appellant, "[O]ffer her $250 and see if she'll take it." According to the investigator, appellant then left with the man.

Finkelman planned to meet with police to report the prostitution ring, but cancelled after he was warned that Rocco "knows the Spencer County captain."[3] Finkelman instead reported it to "internal affairs," who stated, "[W]e'll take this case."

Finkelman then went through Rocco's garbage and stated that what he found was "absolutely amazing." Based on a visa and passport request, a United Airlines jacket, plane ticket stubs, and a photo of a young Asian girl, Finkelman concluded that Rocco was "a sex trafficker importing girls from Southeast Asia to join his ring."

Episode 4: This episode began with a fictionalized dramatization of one of appellant's "girls," a "hooker," visiting a doctor for treatment of an STD. Finkelman reiterated that Rocco was a sex trafficker and claimed Rocco worked with another man, "Albert Borelli." The episode then dramatized a meeting Finkelman claimed he had with the FBI. During the meeting, the FBI stated that "this woman must be stopped" and that it would give Finkelman's evidence to the "high crimes unit."

In an excerpt from an actual local television news broadcast concerning appellant and Finkelman's approaching divorce trial, Finkelman accused appellant of being "the madam and working prostitute of a huge prostitution ring." The news reported that Finkelman, his lawyers, and his investigators stated that they had evidence supporting this claim.

The episode then presented a dramatization where the FBI raided appellant's and Rocco's homes and arrested them. Finkelman was clear that this was fictional and that "this is what I wanted to happen." Finkelman stated he wanted to increase public awareness about his story

---

[3] There is no "Spencer County" in the State of Florida. That is a fictionalized name. When the name of the county was mentioned later in the series, the name of the county was censored or obscured from an actual recording that was played in the series.

of "[a] regular guy discovering that his wife is a hooker and a madam and later on discovering also that that ring is involved in international sex trafficking." The episode ended with another dramatization of appellant and Rocco leaving in a boat for the Bahamas with a bag full of money, but the boat blew up in a fiery explosion.

Episode 5: This episode began by depicting a fictionalized dramatization of appellant's funeral, which was attended by her "girls." This was followed by various scenes from *The Paul T. Goldman Chronicles*, described by Finkelman as a "fiction [series] whose origins are nonfiction," in which Finkelman worked to bring down appellant and Rocco's human trafficking ring.

Finkelman discussed the process of looking for a director to make his book, *Duplicity*, into a film. During a meeting, Finkelman assured the director that appellant's double life and sex trafficking were "all true." In a "pitch" video, Finkelman showed a photo that he described as his "ex-wife meeting with her girls." He then stated, "We've got hookers! We got pimps!" The episode ended with the revelation of Rocco's real name.

Episode 6: In the final episode, Finkelman stated, "I'm not like other people. My mind in my head does not exist. The entire world is an illusion. Everything is a projection of the mind. It's not real. It's like a movie." Finkelman then appeared in a fictionalized scene in which former President Obama said to Finkelman, "Now, you've made some interesting discoveries about your ex-wife." Finkelman met with a media trainer in preparation for the release of this series. When the media trainer asked what the story was about, Finkelman reiterated that he married a madam and working prostitute. In an interview, Rocco admitted to having a relationship with appellant, including during her marriage to Finkelman. During the interview, Rocco referred to appellant by her real name, Diana, and denied being a pimp or being involved in a prostitution ring.

Finkelman continued to maintain appellant was a madam. Finkelman stated that, from the phone logs, it was clear appellant was running a huge business with ten girls working for her. The viewer was told that Diana was contacted to tell her side of the story, but that she declined.

An actual news broadcast was then played stating a couple was found dead at the Cote d'Azur condominiums in Singer Island. A photo was shown of appellant and her parents, with appellant's face obscured. Their first names were captioned on the photo, including appellant's real first name, Diana. The police deemed the two deaths to be a murder-suicide.

Finkelman stated appellant killed her parents and made it look like a murder-suicide.

Finkelman was confronted with a video of "Albert Borelli," whose real name was revealed, whom Finkelman had accused of being involved in sex trafficking. Borelli stated that he was living with Rocco and that the garbage Finkelman took from outside of Rocco's house—which contained airline tickets, a photo, and other paperwork—had belonged to Borelli. Borelli, in fact, had gone to India to do missionary work. The photo of the young Asian girl Finkelman found in the garbage was an orphan in India, who still lived in India. When confronted with this evidence, Finkelman stated: "Well, we'll have to take him out of the book." Finkelman then apologized on camera to Borelli.

The last episode concluded with Finkelman attending the premiere of the docuseries. Finkelman stated, "I'm just a regular guy who all this s--t happened to and decided to take some action." As the credits rolled, numerous "tweets" were shown commenting on the series, including references to the series being "true crime" and a "documentary."

The defendants moved to dismiss the amended complaint. Appellant filed a response in opposition. The trial court granted the motion to dismiss with prejudice for the following reasons. First, the trial court found that the series was a single publication, rather than multiple publications. Second, the series was not "of and concerning" appellant because an average person viewing the series could not reasonably conclude that appellant was Audrey Munson. The series did not mention appellant by name or show any photographs of appellant without her face blurred. Third, the series was not capable of defamatory meaning because (a) the series was a "docuseries," which the trial court equated to a "fictionalized and imagined" "docudrama"; (b) a disclaimer appeared before each episode; and (c) Finkelman's story was portrayed as a "descent into fantasy and self-delusion," and no "reasonable and common minded" viewer would understand Finkelman's statements to be factual or credible. Fourth, the conspiracy claims could not stand because the defamation action failed. Additionally, the conspiracy counts did not identify which of the defendants agreed to commit any unlawful act, or when the agreement to defame appellant was entered. From this order, appellant appeals.

An order granting a motion to dismiss is reviewed de novo. *Rhiner v. Koyama*, 327 So. 3d 314, 316 (Fla. 4th DCA 2021).

Florida affords "high protection of personal reputation . . . ." *Lawnwood Med. Ctr., Inc. v. Sadow*, 43 So. 3d 710, 729 (Fla. 4th DCA 2010). "[A]

6

publication is libelous per se, or actionable per se, if, when considered alone without innuendo: (1) it charges that a person has committed an infamous crime; (2) it charges a person with having an infectious disease; (3) it tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (4) it tends to injure one in his trade or profession." *Blake v. Giustibelli*, 182 So. 3d 881, 884 (Fla. 4th DCA 2016) (quoting *Richard v. Gray*, 62 So. 2d 597, 598 (Fla. 1953)). "[D]amages are presumed to result from defamation per se and need not be proved." *Lawnwood*, 43 So. 3d at 727.

## I. Single vs. multiple publications

Appellant argues the trial court erred in finding that the series was a single publication that occurred in multiple parts. We agree that the trial court erred and determine that each episode is a separate and distinct publication giving rise to multiple causes of action.

"A false statement of fact is the *sine qua non* for recovery in a defamation action." *Byrd v. Hustler Magazine, Inc.*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983). In evaluating whether a publication is defamatory, the "publication must be considered in its totality." *Id.*

Under the "multiple publication rule," "each communication of the same defamatory matter by the same defamer, whether to a new person or to the same person, is a separate and distinct publication, for which a separate cause of action arises." *Musto v. Bell S. Telecomms. Corp.*, 748 So. 2d 296, 297 (Fla. 4th DCA 1999) (citation omitted). "An exception to this rule is the 'single publication rule,' which is applied where the same communication is heard at the same time by two or more persons. The 'single publication rule' treats the communication to the entire group as one publication giving rise to only one cause of action . . . ." *Id.* (citation omitted); *see also* § 770.07, Fla. Stat. (2022) (stating that a cause of action for damages founded upon a single publication accrues at the time of the first publication). "[T]he rationale underlying the single publication rule [is] avoiding a vast multiplicity of lawsuits that would result from defamatory statements contained in a mass publication such as a newspaper or magazine . . . ." *Musto*, 748 So. 2d at 298.

"In Florida, a single publication gives rise to a single cause of action." *Callaway Land & Cattle Co. v. Banyon Lakes C. Corp.*, 831 So. 2d 204, 208 (Fla. 4th DCA 2002) (citation omitted). "The various injuries resulting from it are merely items of damage arising from the same wrong." *Id.* (citation omitted). Under the single publication rule, courts "treat[] a single edition of a newspaper or book as a single publication." *Swedberg v. Goldfinger's*

*S., Inc.*, 338 So. 3d 332, 335 (Fla. 3d DCA 2022). The single publication rule does not apply where the "second publication was not the continued dissemination of a single edition of a book, newspaper, or online article." *Id.* at 336. "[T]he application of the single publication rule turns on the question of whether a separate and distinct decision was made to republish the material. Any modification of the material might shed light on whether a separate decision to republish was made, but the absence of modification does not mechanically place a publication within the single publication rule." *Id.* at 337.

In this case, the trial court erred in finding that the series as a whole was a single publication. Rather, each of the six episodes was a separate and distinct publication, thus giving rise to multiple causes of action. Each episode was akin to a "single edition of a book, newspaper, or online article," which is treated as a single publication. *Id.* at 336. Each episode was "not the continued dissemination" of a previous publication but rather were additional publications. *Id.* The rationale underlying the single publication rule—avoiding multiple lawsuits based on the same publication—was not implicated because each episode was a separate and distinct publication. *See id.* at 335.

In *Swedberg,* a plaintiff whose image was used in social media advertisements by an adult entertainment club brought an action for misappropriating her likeness. *Id.* at 334. The issue was whether the identical posts, published at different times to promote different events, constituted a single publication. *Id.* After analyzing the single publication rule, the Third District concluded that the two posts, although identical, did not constitute a single publication. *Id.* at 335-37.

The fact that multiple publications occurred is even more apparent in this case than in *Swedberg* where identical posts were found to be separate publications. The instant case does not involve a single episode that was simply republished on different days. Rather, there were six separate and distinct episodes, each involving significantly different content, statements, and dialogue. Additionally, the episodes were released on four separate dates. Further, a viewer could have watched a single episode, or several episodes, without viewing the entire series. The viewer could have watched the first episode or dropped off after multiple episodes, which would determine how much of the content the viewer watched. The confrontation undercutting the truth of Finkelman's accusations against "Albert Borelli" was only in episode 6. A viewer who watched the first few episodes would never have seen this "confrontation" of Finkelman, which related to Borelli only. Thus, we find that the six episodes are six different publications subject to six different claims of defamation per se and

conspiracy to defame.

## II. "Of and concerning" appellant

Appellant argues that the trial court erred in finding that the series was not "of and concerning" appellant. We agree that the trial court erred and determine that the six episodes provided ample material indicating that the defamatory statements were "of and concerning" appellant.

"[A] communication is defamatory if it prejudices the plaintiff in the eyes of a 'substantial and respectable minority of the community.'" *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1114 (Fla. 2008); *see also Peck v. Tribune Co.*, 214 U.S. 185, 190 (1909) (stating, in an opinion authored by Justice Oliver Wendell Holmes, Jr., "If the advertisement obviously would hurt the plaintiff in the estimation of an important and respectable part of the community, liability is not a question of a majority vote."). A cause of action for defamation "cannot be maintained unless it is shown that the libelous statements are 'of and concerning' the plaintiff." *Thomas v. Jacksonville Television, Inc.*, 699 So. 2d 800, 805 (Fla. 1st DCA 1997). "[T]he 'of and concerning' requirement is generally a question of fact for the jury . . . ." *Id.* (citation omitted).

The trial court found that the series did not mention appellant by name or show any photographs of her without her face blurred. However, as the filmmaker defendants concede, episode six used appellant's real first name, Diana, on two occasions. Further, "[t]he defamed person need not be named in the defamatory words if the communication as a whole contains sufficient facts or references from which the injured person may be determined by the persons receiving the communication." *Wolfson v. Kirk*, 273 So. 2d 774, 779 (Fla. 4th DCA 1973). As this court has stated:

> It is not essential that the person defamed be named in the publication if, by intrinsic reference, the allusion is apparent, or if the publication contains matters of description or reference to facts and circumstances from which others may understand that he is the person referred to, or if he is pointed out by extraneous circumstances so that persons knowing him can and do understand that he is the person referred to; and it is sufficient if those who know the plaintiff can make out that he is the person meant.

*Harwood v. Bush,* 223 So. 2d 359, 362 (Fla. 4th DCA 1969) (citation omitted); *accord O'Neal v. Tribune Co.,* 176 So. 2d 535, 548 (Fla. 2d DCA 1965).

In *Harwood,* this court reversed the dismissal of a cause of action for libel per se where, although the article failed to identify the plaintiff directly, the "plaintiff has sufficiently alleged that the article was meant to refer to him . . . ." 223 So. 2d at 362. Like in *Harwood,* here appellant sufficiently alleged that people who knew her would have understood the defamatory statements in the series to be about her. The amended complaint alleged that appellant was "easily identifiable as the subject of the false and defamatory statements published by Defendants." The amended complaint alleged, and the series revealed, that the main character's real name was Paul Finkelman, that the real name of his second wife was Diana, and that they were involved in divorce proceedings in Palm Beach County in 2007. Finkelman portrayed himself in the series. The series included excerpts from a local news station reporting on the couple's divorce proceeding. Additionally, as alleged in the amended complaint, and as seen in the series: "The Series also repeatedly shows photos of Plaintiff with her face blurred, shows surveillance films of her, and describes her as being at various specific locations at particular dates and times." The series showed a 2008 petition for injunction against domestic violence appellant filed in Palm Beach County against Finkelman. Thus, the amended complaint, and the series itself, contained sufficient facts and references upon which to identify appellant.

## III. Capable of defamatory meaning

Appellant argues that the trial court erred in finding that the series was not capable of defamatory meaning. We agree with appellant and find that the trial court's reliance on the following three reasons was in error.

### 1. Docuseries

In finding that the series was not capable of defamatory meaning, the trial court found that the series was a "docuseries." The trial court then equated "docuseries," with "docudrama," which the trial court found are "fictionalized and imagined." However, a docuseries and docudrama are not the same. A "docuseries" is defined as "a *documentary* that is telecast in a series of programs."[4] A "documentary," in turn, is "[a] work, such as a film or television program, presenting political, social, or historical subject matter in a *factual and informative manner and often consisting of*

---

[4] Merriam-Webster Online Dictionary, available at https://www.merriam-webster.com/dictionary/docuseries (emphasis added).

*actual news films or interviews* accompanied by narration."[5]  In contrast, a docudrama is "[a] television or movie dramatization of events based on fact."[6]  A person viewing the six-part "docuseries" would expect to see a show that dealt with actual factual events.  Combined with the use of actual news video clips and interviews, the viewer would not expect a "docudrama" but rather would understand it to be a "docuseries."  Thus, we find the trial court erred in finding that the docuseries was equivalent to a docudrama and not capable of defamatory meaning.

## 2. Disclaimer

The trial court also relied on a disclaimer that appeared at the beginning of each episode for about three seconds, which stated: "Statements expressed by individuals in this series should be taken as speculation or opinion and do not reflect the opinions or beliefs of the producers."  Initially, this disclaimer was insufficient because it was directed only to the producers and made no mention of the other defendants.  Further, and more importantly, the disclaimer did not inform the viewer that the series was fictional.  Even when statements are offered with a qualification, "actionable defamatory statements do not become nondefamatory when, as here, the context of the statements swallows up the caveats." *McQueen v. Baskin*, 377 So. 3d 170, 178 (Fla. 2d DCA 2023).  Throughout the series, Finkelman repeatedly stated his story was true.  The disclaimer suggested that statements made in the series were opinions.  "However, a speaker cannot invoke a 'pure opinion' defense, if the facts underlying the opinion are false or inaccurately presented." *Lipsig v. Ramlawi*, 760 So. 2d 170, 184 (Fla. 3d DCA 2000).  "[L]abeling the statements as opinion does not necessarily shield the defendants from an action for defamation." *Anson v. Paxson Commc'ns Corp.*, 736 So. 2d 1209, 1211 (Fla. 4th DCA 1999) (reversing an order of dismissal where defendants published defamatory remarks alleging that the plaintiff was a drug-using prostitute).  Thus, at the motion to dismiss stage, the "disclaimer," as written, does not "shield" the defendants from appellant's causes of action.

## 3. Finkelman's credibility

The trial court found that Finkelman's story was portrayed as a "descent into fantasy and self-delusion" and no "reasonable and common

---

[5] The American Heritage Dictionary of the English Language, available at https://ahdictionary.com/word/search.html?q=documentary (emphasis added).
[6] The American Heritage Dictionary of the English Language, available at https://ahdictionary.com/word/search.html?q=docudrama.

minded" viewer would understand Finkelman's statements to be factual or credible. The trial court failed to apply the correct standard for a motion to dismiss. The trial court failed to accept all well-pled allegations as true and improperly determined factual issues. Because the amended complaint was legally sufficient, the trial court erred in granting the motion to dismiss.

A motion to dismiss tests the legal sufficiency of the complaint and does not determine factual issues. *Rhiner*, 327 So. 3d at 316. "All allegations of the complaint must be taken as true and all reasonable inferences drawn therefrom must be construed in favor of the non-moving party." *Id.* (citation omitted). "[I]f the analysis of a claim is factually intensive, it is better addressed on a summary judgment motion, or at trial, but certainly not on a motion to dismiss." *Id.* (citation omitted). In ruling on a motion to dismiss, "a court's gaze is limited to the four corners of the complaint, including the attachments incorporated in it . . . ." *Alevizos v. John D. & Catherine T. MacArthur Found.*, 764 So. 2d 8, 9 (Fla. 4th DCA 1999). Thus, the trial court's review was limited to the complaint and the contents of the six episodes of the series itself.

A trial "court has a 'prominent function' in determining whether a statement is defamatory . . . ." *Smith v. Cuban Am. Nat'l Found.*, 731 So. 2d 702, 704 (Fla. 3d DCA 1999). "Where the court finds that a communication could not possibly have a defamatory or harmful effect, the court is justified in either dismissing the complaint for failure to state a cause of action or in granting a directed verdict at the proof stage." *Wolfson*, 273 So. 2d at 778; *see also McIver v. Tallahassee Democrat, Inc.*, 489 So. 2d 793, 794 (Fla. 1st DCA 1986) ("If the publication can bear only one meaning, the question of defamation is for the judge."). "Where, however, a communication is ambiguous and is reasonably susceptible of a meaning which is defamatory, it is for the trier of fact to decide whether or not the communication was understood in the defamatory sense." *Wolfson*, 273 So. 2d at 778-79 (reversing dismissal of a complaint for slander where the trial court erred in determining that the words were not reasonably susceptible of defamatory meaning). To determine whether a communication is defamatory, "the trial court must evaluate the publication, not by 'extremes, but as the common mind would naturally understand it.'" *Byrd*, 433 So. 2d at 595 (citation omitted).

It is clear that the docuseries is "reasonably susceptible of a meaning which is defamatory." *Wolfson*, 273 So. 2d at 779. In each and every episode, and throughout the series, Finkelman repeatedly accused appellant of being a prostitute, a madam, and part of a sex trafficking ring. For example, Finkelman accused appellant of living a "secret double life"

and being involved in a "multi-million dollar crime ring." Finkelman stated that what he found "turned into a whole new level of criminality." Finkelman stated that based on appellant's phone records, and his research, he discovered appellant was a "hooker" who had sex with over a thousand men. Based on the same phone records, Finkelman also stated appellant was a madam with a huge business and ten girls working for her. Finkelman stated that a surveillance video with appellant and two women at a park depicted "hookers praying to Jesus for more tricks" and that this was "not a little prostitution ring." An investigator stated that while at a nightclub, Rocco, appellant's alleged pimp, offered appellant to another man for $250. In a "pitch" for the series, Finkelman stated his investigator took a photo of appellant "meeting with her girls" and further stated, "We've got hookers! We got pimps!" Finkelman also accused appellant of murdering her parents and her making it look like a murder-suicide. These are just a few examples of Finkelman's allegations that are replete throughout the series.

In each and every episode, and throughout the series, Finkelman repeatedly maintained that the allegations against appellant were all true and that what was depicted in the series actually happened to him. Although some statements can be "so obviously comedic and nonsensical that no sensible person would take them seriously," *Ford v. Rowland*, 562 So. 2d 731, 735 (Fla. 5th DCA 1990), that was not how the allegedly defamatory statements were presented in this series. The series was presented in a way to convey indicia of truthfulness, relying on "evidence" such as surveillance videos, interviews with private investigators, actual news clips, and court documents, as well as a photo of Palm Beach County Sheriff Ric Bradshaw. Others, such as the director and the private investigator, offered statements corroborating Finkelman's claims. For example, the director stated Finkelman "had an incredible true story to tell" and that "[t]his is his story." Finkelman himself stated, "It's all true. It happened to me" and "I couldn't make this up." Finkelman stated that his book, *Duplicity*, upon which the series was based, was as "accurate as it is unbelievable." Later, Finkelman reaffirmed that *Duplicity* was 99% true and that only little things were embellished. Finkelman once again confirmed that "[t]he story is true. The events are true." He then clarified that his story was approximately 97% true "and none are made up that have any bearing to criminal events by Audrey Munson [appellant] and what happened to me. Every single thing of that is true." A news clip reported that Finkelman, his lawyers, and his investigators stated they had evidence that appellant was a madam and a working prostitute of a large prostitution ring. Finkelman also assured the director that appellant's double life and sex trafficking were "all true." Finkelman finally stated, "I'm just a regular guy who all this s--t happened to and decided to

take some action."

Although at times Finkelman admitted he made up certain scenes and dialogue, at no point did Finkelman admit or suggest that he fabricated the core allegations about appellant being a prostitute, madam, and sex trafficker. Rather, he consistently and adamantly maintained the truthfulness of those allegations. Finkelman's admission to making up certain specific scenes, while maintaining the veracity of those allegations pertaining to appellant, further bolsters the conclusion that the accusations relating to appellant were reasonably susceptible of defamatory meaning. While episode six may have cast doubts on Finkelman's claims concerning Borelli's participation in sex trafficking, at no point did Finkelman ever retract his statements concerning appellant. Simply put, even assuming a viewer watched all six episodes, nothing in episode six exculpated appellant from Finkelman's allegedly defamatory allegations. Finally, since the episodes clearly can bear more than one meaning for the viewer, the question of defamation was not for the trial court to determine. *McIver*, 489 So. 2d at 794.

Again, a motion to dismiss tests only the legal sufficiency of the complaint, and the allegations therein are to be taken as true. *Rhiner*, 327 So. 3d at 316. Taking the allegations of the amended complaint and the series as true, appellant clearly stated legally sufficient causes of action for defamation. "When a statement charges a person with committing a crime, the statement is considered defamatory *per se*." *Blake*, 182 So. 3d at 884 (citation omitted). "Statements which impute unchastity on the part of a woman plaintiff are libelous per se." *Ford*, 562 So. 2d at 735 (citing *Campbell v. Jacksonville Kennel Club*, 66 So. 2d 495, 497 (Fla. 1953)). In *Ford*, the Fifth District reversed the dismissal of a libel claim for a jury determination of whether the term "hooker," as used in a poem, could be understood as factually referring to the plaintiff. *Id.* at 735. Like in *Ford*, here the statements accusing appellant of being a prostitute, madam, and sex trafficker require a jury determination of whether the statements could be understood as describing an actual fact about her. Because the statements were "reasonably susceptible" of a defamatory meaning, it is for the trier of fact to determine whether the communication was understood in the defamatory sense. *Wolfson*, 273 So. 2d at 778-79. Thus, the trial court erred in granting the motion to dismiss.

### IV. Conspiracy allegations

Appellant next argues that the trial court erred in dismissing the conspiracy allegations because they were legally sufficient. We agree the trial court erred. A cause of action for defamation is "a necessary predicate

to a cause of action for conspiracy to defame . . . ." *Hoon v. Pate Constr. Co.*, 607 So. 2d 423, 430 (Fla. 4th DCA 1992). Where a defamation claim fails, "an action for conspiracy to defame predicated on such defamation must also fail." *Id.* Because we find the defamation claims were legally sufficient, the conspiracy claims do not automatically fail.

The elements of civil conspiracy are: "(a) a conspiracy between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts performed pursuant to the conspiracy." *Gordon v. Bethel*, 359 So. 3d 802, 810 (Fla. 4th DCA 2023) (citation omitted). "Each coconspirator need not act to further a conspiracy; each need only know of the scheme and assist in it in some way to be held responsible for all of the acts of his coconspirators." *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1160 (Fla. 3d DCA 2008) (internal quotation marks and citation omitted). "The existence of a conspiracy and an individual's participation in it may be inferred from circumstantial evidence." *Donofrio v. Matassini*, 503 So. 2d 1278, 1281 (Fla. 2d DCA 1987).

In the instant case, the conspiracy to defame counts alleged:

- "Defendants acted in concert to further a scheme to shame, defame, and disgrace [appellant] by falsely uttering words of slanderous character."

- "Defendants performed overt acts in pursuance of the conspiracy by producing, creating and distributing the Series, and publishing false defamatory statements about [appellant] to third parties."

- "The statements of criminal conduct by [appellant] published by Defendants in [each of the six episodes and, alternatively, the series as a whole] are false and defamatory per se."

The conspiracy to defame counts contained sufficient allegations to set forth a cause of action for conspiracy. The trial court erred in finding that the conspiracy counts were insufficient. The trial court found that the conspiracy counts did not identify which of the defendants agreed to commit an unlawful act. At this juncture in the proceedings, however, by using the term "Defendants," the amended complaint clearly referred to all of the defendants. The trial court also found that the conspiracy counts did not allege when the agreement to defame appellant was entered.

15

However, there is no requirement that a party allege a specific time when the agreement to defame was entered. *See Gordon*, 359 So. 3d at 810 (setting forth the elements of civil conspiracy). Thus, we find appellant sufficiently alleged causes of action for conspiracy to defame.

## V. Pre-suit notice

In moving to dismiss, the defendants argued that appellant failed to provide pre-suit notice as required by section 770.01, Florida Statutes (2023). Although the trial court expressly declined to consider this issue, we note, for purposes of remand, that this statute is inapplicable to this case, which does not involve "media defendants."

Section 770.01, Florida Statutes, states:

> Before any civil action is brought for publication or broadcast, in a newspaper, periodical, or other medium, of a libel or slander, the plaintiff shall, at least 5 days before instituting such action, serve notice in writing on the defendant, specifying the article or broadcast and the statements therein which he or she alleges to be false and defamatory.

In the present case, it is clear that the pre-suit notice requirements of section 770.01 were not applicable. The statute applies only to "media defendants." *Zelinka v. Americare Healthscan, Inc.,* 763 So. 2d 1173, 1175 (Fla. 4th DCA 2000). The defendants were not "media defendants" because they were not "engaged in the dissemination of news and information through the news and broadcast media . . . ." *Mancini v. Personalized Air Conditioning & Heating, Inc.*, 702 So. 2d 1376, 1380 (Fla. 4th DCA 1997). The purpose of the statute, which is to afford media defendants an opportunity "to make a full and fair retraction," is not implicated here. *Ross v. Gore*, 48 So. 2d 412, 415 (Fla. 1950). Thus, the statute does not apply.

Although we express no opinion on the ultimate merits of this case, *see Black v. Cable News Network, Inc.*, No. 4D2023-1257, 2025 WL 2608689, at *7 (Fla. 4th DCA Sept. 10, 2025), appellant has sufficiently alleged causes of action for defamation per se and conspiracy to defame through the medium of a docuseries widely available through Peacock TV. Peacock TV can be accessed through a streaming service easily and is readily obtainable. Justice Cardozo wrote nearly one hundred years ago, long before the advent of modern technology, that what gives defamation its "sting" is "its permanence of form" which "perpetuates the scandal."

*Ostrowe v. Lee*, 175 N.E. 505, 506 (N.Y. 1931). The allegations of defamation in this case, through this medium, illustrate the potential for such damage.

In summary, for all the foregoing reasons, we hold that the trial court erred in dismissing the amended complaint with prejudice. Accordingly, we reverse the dismissal order and remand for further proceedings consistent with this opinion.

*Reversed and remanded for further proceedings.*

CIKLIN and FORST, JJ., concur.

\* \* \*

***Not final until disposition of timely-filed motion for rehearing.***